Case No. 15-1346, Free Access & Broadcast Telemedia, LLC, et al. petitioners v. Federal Communications Commission, et al. Mr. White for the petitioners, Mr. Lewis for the responder. Good morning. Sorry to interrupt. Take your time. If I may reserve two minutes for rebuttal. Given that the court's already started to delve into the issues of the case, let me just dive in on two specific points that were raised here today. Can I ask you to dive into standing first? Yes, Your Honor. Yes, Your Honor. We believe... I'm not certain why you have standing, or if you have standing. Yes, sir, Your Honor. We believe that our showings and the declarations attached to the briefs, coupled with the materials and the record of itself for the FCC, demonstrate that our clients have suffered actual injuries that are concrete and particularized. And the word of God was not a party agreed with, because they were not in the preceding flood. Yes, sir. We concede that within the meaning of current precedent in this circuit, word of God fellowship is not a party agreed with in the meaning of the Hobbs Act. And how is free access... how do they have Article III standing? They have Article III standing for two reasons. They suffer an injury to the value of their current investments, options to purchase stations outright. Now, ordinarily, shareholders, for example, do not have standing in an action which injures the corporation, which thereby presumably is going to injure the value of their shares. Why does an option holder have a greater claim to standing than a shareholder does? Well, first of all, just to be clear, these aren't options to buy shares. These are options to purchase stations outright from other companies. Notice I carefully did not word that as being options to buy shares. Yes, sir, but there has been some cases of confusion. These option holders' free access has superior rights for purposes of litigation, Article III standing, than do normal shareholders, for two reasons. One, the current owners are not fiduciaries to these option holders. They're counterparties. They've assigned and sold rights. I'm not really sure why that matters. Well, if you look at franchise tax and the other cases that invoke this doctrine when it has been invoked, they make clear that the shareholder doctrine exception is a prudential doctrine that's based on the normal relationship between the board of directors acting as fiduciaries to shareholders, standing in their shoes and exercising the rights of the corporation, rights exclusively held by the corporation. In that respect, the shareholders are not litigating their own rights in those cases. They're trying to litigate the rights and interests of the corporation itself. Here in this case, free access is litigating in service of its own property rights. These contractual interests to purchase. But those are just derivative of the rights of the corporation, right? I mean, there's no injury to the corporation. There's no injury to the option holders. I mean, it's derivative. And I thought sort of the hallmark of the prudential standing approach is whether it's derivative or not. Is that wrong? I don't know that I'd say it's derivative. It's surely related. Actions that impact an LPTV station will impact the value of options to buy those stations. But I want to make perfectly clear— I'm not sure how big a door you're asking us to open. I understand these are not stock options. But would not the same kind of logic apply to stock options? Say you've got an option to buy 50% of the station instead of 100%. And the 50% is represented by shares in an LLC or subchapter S. Are you saying that you would then have a right to bring an action because the value of your option is being diminished? I'm not saying that. We're not quibbling with the shareholder standing exception itself. All that we're asking is that the court not expand that doctrine to the extent it's already been applied. And it seems that it's been applied only in very limited circumstances. We're asking that the court not expand that doctrine to include entities that aren't shareholders, whose interests aren't perfectly aligned with the corporation itself. And I want to make that clear. Free access's interests are not aligned perfectly with the interests of the current owners. The current owners own a variety of stations, both auction-eligible stations, Class A or full service, and LPTV stations. The current owners may not find it in their interest to challenge this auction where they stand to make millions of dollars selling their auction-eligible station spectrum usage rights back to the FCC. Free access stands solely to vindicate this provision. They have no other contrary interest in this case, unlike the current owners of a portfolio of stations auction-eligible and eligible. When your client bought their property interest, they knew that this sort of thing could happen, right? This happens all the time. They were buying interest in an entity that was secondary to a whole host of players. Well, I would like to get into what secondary means. But to be very clear here, what's happening here has not happened before. This incentive auction structure, this double auction with the reorganization in the middle, has never happened before. As far as I know, this is the first of its kind. This is an experiment by Congress. And as we've said in our briefs, our position is the FCC is expanding the meaning of secondary beyond its limited purposes and its prior rulemakings. And that's even assuming that the term spectrum usage rights, which Congress used, incorporates every jot and tittle of an FCC rulemaking sort of explaining its version of what a spectrum usage right is. Can I say something? I think it's important to understand exactly what the distinction is between the interests of you as an auction holder and the interests of the license holder itself. So you're making the point that the owners have different interests because they have other ownership interests, too? Well, I'm not saying that there's a difference that goes to spectrum usage rights. I'm just saying as to the prudential question, our interests are now perfectly aligned with the interests of the current owners of the stations. And I'm just trying to understand, does that distinguish shareholders all the time? In other words, couldn't you have the same situation where what your option entails is an option to purchase shares, option to purchase equity in the company, that you still have the situation in which the company, the owners of the company whose shares you could have the option to buy would still have disparate interests because they might be owners of other companies, too? That's true. They might have a diverse portfolio. Yeah. Again... So how does it distinguish? If that's true, unless I'm missing something, I'm not understanding how that distinguishes you from the company in a way that would distinguish your situation from the shareholder situation. Well, prudential standing doctrines, including the shareholder exception, they're prudential doctrines that depend on the facts of given cases. So while it may be true that in a given case a diversified investor who has options to buy shares may have interests that diverge from the company itself, it's not necessarily all the time. It's not necessarily every case. And we know for a fact in this case my client, this non-shareholder, has interests that in fact diverge. We know that they diverge from the interests of their counterparties, the companies from which they bought these options. But I don't think you could say that the holder of an option to purchase shares is any better off than the owner of the shares. I would say that in this case my client is in a better position to litigate the statutory term at issue in this case, 1452b-5. His only stake in this case is to maintain the LPTV protection or the non-alteration provision. That's the only interest in this case, whereas the current owners, they may have qualms with that. They might or might not. They might or might not. The fact of being a shareholder as opposed to an option holder does not in itself imply a different interest. There's no reason to think a shareholder has other interests. They may or may not. I doubt seriously if you could demonstrate that all the shareholders involved here do have divergent interests. Maybe you could. It doesn't matter whether you're good or not. Don't cry because it doesn't matter. Because the shareholder standing rule still applies regardless of divergent interests of the shareholders themselves, and it just seems that if that's true, it seems hard to stomach a doctrine whereby a person who's one step more removed, which is an option to purchase the shareholders, would then have a better position vis-a-vis standing. Well, if I may put it this way, just until you said at the outset of this, it seems a heavy oar I'm asking you to row. We're asking that the court not row an oar here. We're just asking the court to respect the bright-line rule that's been previously enunciated and to not expand it still further to cover non-shareholders because, again, we do believe our interests have diverged. If nothing else, if I may say this. But aren't you asking us to do something quite novel? You're asking us to give you rights that we have heretofore not given to someone who has a greater property interest than you do. That's really quite remarkable. If I may, I don't think it's a question of a greater or lesser property interest. I think it's a fundamental difference. We are counterparties with the corporation. We have separate interests. They're not our fiduciary. They're our counterparty. It's not about greater or lesser. It's about a difference in the relationship between us and the company that currently owns the stations. If I may make just a couple of points on the merits that arose near the end. If I understood my friend correctly, he said that the difference that B-5 makes, in addition to not increasing the rights of LPTV stations, and I would like to remark on that for just a moment, he said that if that provision wasn't there, then the FCC could have exercised discretion to give LPTV stations the full rights of 1452 B-2. In fact, in this proceeding, the FCC claimed that they had discretion to give that protection to LPTV stations. It wasn't that they were barred from it. It's that they said they were exercising the discretion not to. And so I think that example doesn't hold. That's not an added protection that B-5 gives LPTV stations that they wouldn't enjoy in its absence. And if I may, we've talked about the powers that the FCC may or may not exercise in lieu of B-5. But for purposes of this discussion, it's important to focus attention on B-1. This is what spells out what the FCC can actually do, their substantive power in reorganization. Not repack, a word that Congress did not use, but reorganization. I think it's a very different term. At B-1, capital B-1 and 2, the FCC may make such reassignments of television channels as it considers appropriate, or two, it may reallocate such portions of such spectrum as the commission determines are available for reallocation. They can take spectrum that's available for reallocation, and they can reallocate it. Or they can reassign channels. The LPTV stations now operating and licensed by the FCC, their spectrum is not available for reallocation. They have licenses from the FCC to continue to operate so long as they are not interfering with other primary users. And we believe that's limited and should be limited to primary full-service television. But at the very least, our spectrum is not available for reallocation. What do you say with reference to that question about what you're secondary to, to the 2002 proceeding use of the term new wireless service in relation to what you're not interfering with? Well, two points, Your Honor. First of all, we don't take for granted that spectrum usage rights, the term employed by Congress and not defined by Congress, necessarily incorporates every single statement from the FCC. Okay, I understand that point. Second. The next question being, though, what you're saying there, I take it, is that primary interference does not mean primary for all purposes. That's exactly right, Your Honor. That's the point we're trying to make. That begs the question, though, as to what you are secondary to. You asserted in your brief, if I read it correctly, that there's nothing before this proceeding that makes you secondary to anything but full-power stations and Class A stations. The commission in their brief, I think in this case, these two are running together in my mind right now, but I think in this case that's the 2002 proceeding in which they do use the term new wireless service in reference to what you can't interfere with. Yes, Your Honor, and we recognize that they said that in the 2002 order. Let me make two points. First of all, the court need not reach this question of the primary-secondary relationship between LPTV stations and licensed wireless. Because before you even reach that issue, the fact remains the FCC is clearing room not just for licensed wireless, but for unlicensed wireless. They made that clear throughout the report and order and the second order at issue in this case. Not just the subsequent rulemaking, but in this case, they've announced and reiterated that policy. We are certainly primary to unlicensed wireless, a point that the FCC itself has made before. There's no question about that. Now, with respect to are we primary to licensed wireless, we didn't challenge the 2002 rulemaking. We weren't around to challenge it. We would challenge it, at least as applied in this rulemaking, because we're not causing interference with licensed wireless. We're not. The only reason why we could be deemed to be causing interference with unlicensed wireless is because the FCC is truncating the television band. They're carving about 20 channels off the television band and packing us all in to make room for licensed wireless. Something that's never been done before in this context where the result is actually to leave far too few seats on the plane or whatever the metaphor, the best metaphor is. Metaphors don't work all at will anyway. But if I may, in this context, we think this goes far beyond just secondary interference with unlicensed wireless. They're carving us out and moving us aside to make room for unlicensed wireless. We're not secondary in that respect. Okay. We have your argument. Thank you. Thank you very much. We'll hear from the commission now. May it please the Court again. I think, as the Court recognizes, there is a threshold standing issue, and I think it can be summarized in that the free access petitioners are not even shareholders. So if they were shareholders, they would be precluded under the shareholders standing doctrine. I think they have less of a claim to standing because they are not even shareholders. This option is an option, even though to describe it in most general terms is to buy the entire licensee or some of these stations. I mean, those are presumably some of them corporations. They're buying shares, whatever. They have anticipated that they have a right to buy shares. That would seem to put them in an even more indirect position. But the main point is their injury is entirely derivative of injury to the licensee itself. And nothing is preventing the licensees from suing. They may have divergent interests, but that can, as I think the Court recognizes, can happen in any number of situations. What do you do with the argument that was put forward to the effect that they're differently situated because there's no fiduciary obligation? And the reason I ask that is that to the extent that the reason shareholders can't bring suit is because their interests, which otherwise would satisfy Article III, are already taken account of by somebody else, then one could still be left with the argument that, well, then the option holder in shares also has an Article III interest, but their interests are not otherwise accounted for by the corporation because there's no fiduciary relationship vis-a-vis. Well, I think that, in fact, the issue there is that the shareholder standing doctrine is a subset of a general concern about letting parties assert the rights of third parties. And so there is a particularized situation when you're talking about shareholders, and certainly there is a different relationship there. I would argue that the relationship causes the shareholder to have more of a stake in the underlying licensee or the underlying corporation. But nonetheless, if you just want to... On the other hand, though, in a corporate circumstance, a shareholder can bring a derivative action against the corporation or ultimately the name of the corporation, which protection an option holder cannot do. Well, that's true, but I think that aspect of the law maybe characterizes a recognition of the shareholder's even greater interest in what the corporation does. To that extent, these option holders are even more strangers to the corporation. But I do think you would be opening up a Pandora's box if you allow for standing in this kind of case because it would just allow a roadmap of coming up with structuring financial instruments in a way. It's, no, no, I don't want shares. Don't give me shares because I'm planning to sue. I'll give you money for some constructed option. And that seems utterly inconsistent with the notion of prudential standing, which is you really want the parties with a real stake or that have the most stake in the outcome of a lawsuit to be before you. Here you would be allowing parties which have only the most indirect stake to come before the court. So I think that that's a difficulty, a significant difficulty in the outset. It means if free access is, we believe, black standing, there's no need for the court to reach the merits questions. I would say one thing about free access focused on the unlicensed use, which is a variant of the argument on B-5 that somehow the commission in the repacking is subordinating low-power television stations to unlicensed users. There are portions of the ban plan that are available for unlicensed use. Those are the so-called guard bans. And there are specific provisions in the Spectrum Act that basically take objections to the use of the guard bans off the table. That's 1454. And so 1454 says nothing in section 1452 prevents the commission from constructing guard bans, and specifically in 1454 C says it can be used for unlicensed use. So I think that deals with that question. There is an additional suggestion with regard to a proposal that's before the commission to reserve some other channels. That proposal remains a proposal. Free access or a party with standing has the ability to sue the commission if and when the commission were to adopt that proposal. So, Jay, I just have one minute in which you have a couple minutes left. Can I just ask you one question? Sure. Which is if you had to come up with the best practical distillation of how B-5 does work, is that one the one that you had in the prior argument, which is the noninterference point, that otherwise the commission would have authority potentially to displace an LPTB without regard to interference? Yes, and I think that's the best example. I think just to cue into the language of B-5 I think gets you to where you want. It prevents the commission from altering the spectrum usage rights. So if you conclude that somehow either augmenting or undermining the prior spectrum usage rights, that would be prevented and the commission relied on B, an important ingredient. So there may be other examples as well, but that's probably the clearest example, saying because we all agree that LPTB stations have a right to operate as long as they don't cause interference. If for some reason in the course of deriving authority from B, the commission were to say, no, we're just changing the rules on that. You're the standby passenger. Yes, there is a seat on the plane. No, you can't get on. Then that would be a problem. Yeah. Okay. Thank you. Your Honor, if I'm a standby passenger on the plane, they might not let me get on the plane on the first instance, but we're on the plane. The plane is in flight. We're operating pursuant to licenses. They can't ask us to give up our seats mid-flight for the basis of no fault of ours. Yeah, that's it. Before Medford never really worked on it. Let me just avoid metaphors and just make this point clear. They're setting LPTB stations outside. They're moving them away from their channels. They're taking away their spectrum usage rights, not because of interference. They've already cleared the spectrum down to channel 29 through no interference, nothing caused by LPTB stations. It has nothing to do with anything that we've done. And one more point. The spectrum usage rights, these are rights that are supposed to protect us in the reorganization process, not in the aftermath of the repack, as they call it. These are the rights that protect us in the context of 12B. The provision says nothing in this subsection, 12B. That's where our rights attach, in that process. They're telling us that we can exercise our rights in the aftermath of the repack. Once everything's been packed as tightly as possible, then we can exercise whatever practical rights we have left. There's no indication, though, on my very last point. You said, Your Honor, perhaps B-5 was intended to make sure the FCC didn't enlarge our rights. The fact is there's nothing in the record or in the legislative history that indicates that was ever even a possibility. Two years before the Spectrum Act, the FCC staff made clear in the broadband plan that they wanted to repack the spectrum at the expense of LPTB stations. Two years later, when Congress wrote this statute, they included this provision, notwithstanding the FCC's proposal. And in the aftermath of the act, the FCC continues to persist, one, in calling it repack, not reorganization, their term, not Congress's, their term from the broadband plan and today, without any regard for the substantive protection of B-5 in the actual operation and mechanics of the reorganization. Thank you. Thank you very much. The case is submitted.
judges: Griffith, Srinivasan, Sentelle